ASSOCIATED GENERAL CONTRACTORS OF NORTH DAKOTA, a non-profit corporation, Plaintiff,

v.

OTTER TAIL POWER COMPANY, a corporation, and Bechtel Corporation, a corporation, Defendants.

Civ. No. A78–1009.

United States District Court,
D. North Dakota,
Southwestern Division.

Sept. 19, 1978.

As Amended Nov. 6, 1978.

---

John D. Kelly and Douglas R. Herman, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, N. D., for plaintiff.

J. Gerald Nilles, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., for Bechtel.

William R. Pearce, Pearce, Anderson, Thames & Durick, Bismarck, N. D., for Otter Tail.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

The above-entitled action was initiated in the District Court of Mercer County, North Dakota, and was subsequently removed to this court pursuant to 28 U.S.C. § 1441. The basis for removal was the diversity of citizenship of the parties. 28 U.S.C. § 1332. The matter is now before the court on defendant Bechtel Corporation's motion to dismiss, and for purposes of the motion the court assumes the factual allegations of the complaint to be true.

Plaintiff is a non-profit corporation organized and existing under the laws of North Dakota. It exists to encourage and promote fair competition, improvement in labor conditions and the elimination of unfair and unethical practices in the construction industry in North Dakota. Plaintiff's members are contractors engaged in building, highway, and heavy construction in North Dakota. Plaintiff's current active membership is 138 general contractors, over one-half of whom are parties to collective bargaining agreements relating to wages, fringe benefits and other terms and conditions of employment to be provided to their employees.

Defendant Otter Tail Power Company (Otter Tail) is a foreign corporation authorized to transact business in the State of North Dakota. Otter Tail is the co-owner, along with Montana-Dakota Utilities and Minn-Kota Power Cooperative, of the Coyote # 1 Fossil Fuel Power Plant, now being built in Mercer County, North Dakota. Otter Tail acts as the representative and agent of its co-owners in connection with the construction of the Coyote # 1 Power Plant.

Defendant Bechtel Power Corporation (Bechtel) is a foreign corporation authorized to transact business within the State of North Dakota. Bechtel acts as architect-engineer and general contractor for the Coyote # 1 Plant, pursuant to a contract with defendant Otter Tail.

In late 1977, Bechtel, on behalf of and with the full knowledge and consent of Otter Tail, entered into a written "Stabilization Agreement" with numerous labor unions, *covering all construction work to be performed on the Coyote # 1 Power Plant.* The Stabilization Agreement provides, *inter alia,* that the signatory labor unions are to be the sole and exclusive bargaining representatives for certain classes of manual employees on designated jobsites, that contractors performing construction work on the Coyote # 1 Power Plant use union registration facilities and referral systems in filling job vacancies, and that any subcontracting done by contractors be only to persons, firms or corporations whose employees are represented by a lawfully established, bona fide union and who are compensated under a collective bargaining agreement meeting minimum standards set out in the Stabilization Agreement. The agreement is now in effect.

Plaintiff Associated General Contractors (AGC) alleges in Counts 1 and 2 of its amended complaint that the Stabilization Agreement violates §§ 1 and 2 of the Sherman Anti-trust Act, 15 U.S.C. §§ 1 and 2.[1] In Counts 3 and 4 of its amended complaint, plaintiff alleges the Stabilization Agreement violates the right to work and the freedom of employees to engage in or refrain from the process of collective bargaining guaranteed by North Dakota law. In Count 5 of its amended complaint, plaintiff alleges that the Stabilization Agreement constitutes direct economic intimidation designed to induce AGC's member contractors to alter their mode of business, contrary to North Dakota law. Plaintiff seeks a declaratory judgment under 28 U.S.C. § 2201 that the Stabilization Agreement is illegal, void and unenforceable because it violates the Sherman Act and the laws and public policies of the State of North Dakota. Plaintiff also prays that defendants be enjoined from subscribing, administering, honoring and enforcing the terms and conditions of the Stabilization Agreement.

Defendant Bechtel has moved to dismiss the complaint. Bechtel contends AGC has no standing under 15 U.S.C. § 26 to sue under the anti-trust laws, and that the state law claims are preempted by federal labor law, and are thus subject to the exclusive jurisdiction of the National Labor Relations Board.

### I. *The Anti-trust Claims*

Plaintiff contends that Article II of the Stabilization Agreement forces AGC member contractors, both union and non-union, to recognize particular unions as the exclusive collective bargaining agents for their employees on the Coyote # 1 project to be eligible to work as a contractor on the project. This allegedly restrains trade and competition in the construction industry in violation of §§ 1 and 2 of the Sherman Anti-trust Act, 15 U.S.C. §§ 1 and 2. Article II of the Stabilization Agreement provides us follows:

It is recognized by the parties that the Unions signatory hereto are the sole and exclusive bargaining representatives for the classifications of manual employees, included in Appendix "A" attached hereto employed by the Contractors signatory to this Agreement, on the specific jobs designated herein.

Plaintiff also contends that Article XIV of the Stabilization Agreement forces AGC member non-union contractors into collective bargaining relationships with particular unions in order to be eligible to work as subcontractors on the Coyote # 1 project. It is alleged that this also restrains trade and competition in the construction industry in violation of the Sherman Anti-trust Act. Article XIV of the Stabilization Agreement provides in part as follows:

The Contractor shall have the right to subcontract work, provided that any work which is subcontracted at the site of the construction, alteration, painting or repair of a building, structure or other work covered by this Agreement, shall be subcontracted only to persons, firms or corporations whose employees are represented by a lawfully established, bona fide Union and who are compensated under a collective bargaining agreement which provides for wages, hours and other economic conditions of employment not less than those provided for in this Agreement. This provision shall apply to and operate at only those jobsites covered by this agreement where the Contractor is employing some of its own employees, who are represented by the Unions, and only at such time on these jobsites when such employees are employed.

The employer shall be required to advise the Building and Construction Trades Department, AFL–CIO as soon as practicable but prior to start work by the Contractor or Subcontractor, of all contracts entered into. Violations of these provisions shall be subject to the griev-

---

**1.** The Sherman Act claims were not in the original complaint, but were added by amendment after removal to this court.

ance and arbitration procedure established in this Agreement.

Jurisdiction to hear these claims is conferred on this court by 28 U.S.C. § 1337, which gives original jurisdiction to the district courts to hear cases arising under the anti-trust laws.

Plaintiff seeks an injunction under section 16 of the Clayton Act, 15 U.S.C. § 26, and a declaratory judgment that the Stabilization Agreement is illegal, void and unenforceable. 28 U.S.C. § 2201.

Defendant Bechtel has moved to dismiss the anti-trust claims on the ground that plaintiff AGC does not have standing to assert the claims of its member contractors under the anti-trust laws. AGC alleges no injury to itself in its complaint.

■■■ The courts will not take action in a controversy unless it is first determined that standing exists. Unless the plaintiff can show some cognizable injury, the court should not consider the merits of an action.[2] *Warth v. Seldin,* 422 U.S. 490, 517–18, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Santos v. District Council of New York City and Vicinity of United Brotherhood of Carpenters and Joiners of America, AFL–CIO,* 547 F.2d 197, 199 (2d Cir. 1977).

■■■ The Supreme Court, in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), created a two-part test for standing. Standing exists if "the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise," 397 U.S. at 152, 90 S.Ct. at 829, and if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. The two parts of the standing test are not stated in the alternative; unless both parts are satisfied, plaintiff does not have standing to sue. *See In re Multidis-*

trict *Vehicle Air Pollution M. D. L. No. 31, State of California v. Automobile Manufacturers Association, Inc.,* 481 F.2d 122, 126 (9th Cir. 1973), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *reh. denied,* 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974).

AGC in its complaint alleges no injury to itself. It asserts the rights of its member contractors and contends the Stabilization Agreement injures or threatens to injure them.

■■■ AGC does not satisfy the standing test of the Supreme Court enunciated in *Data Processing, supra,* because it has not alleged an injury *to itself.* An association has no standing to assert the rights of its members under the antitrust laws. Any right of action belongs to the members of the association, and the association cannot assert that right derivatively. *Burleigh House Condominium, Inc. v. Buchwald,* 546 F.2d 57 (5th Cir. 1977); *Buckley Towers Condominium, Inc. v. Buchwald,* 533 F.2d 934 (5th Cir. 1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977); *Farmers Co-op Oil Co. v. Socony Vacuum Oil Co., Inc.,* 133 F.2d 101 (8th Cir. 1942); *NAACP v. New York Clearing House Association,* 431 F.Supp. 405 (S.D.N.Y.1977); *Cordova v. Bache & Co.,* 321 F.Supp. 600 (S.D.N.Y.1970).

Most of the cases involving the denial to an association of standing to sue on behalf of its members arise under § 4 of the Clayton Act, 15 U.S.C. § 15, which allows private suits to recover treble damages for injuries caused by violation of the anti-trust laws. *See, e. g., Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Burleigh House Condominium, Inc. v. Buchwald,* 546 F.2d 57 (5th Cir. 1977); *Buckley Towers Condominium, Inc. v. Buchwald,* 533 F.2d 934 (5th Cir. 1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct.

---

2. The rationale for the standing rule is to insure that the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

1157, 51 L.Ed.2d 571 (1977); *Nassau County Association of Insurance Agents, Inc. v. Aetna Life & Casualty Co.,* 497 F.2d 1151 (2d Cir. 1974), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); *Farmers Co-op Oil Co. v. Socony Vacuum Oil Co., Inc.,* 133 F.2d 101 (8th Cir. 1942). Plaintiff here seeks not treble damages, but an injunction and declaratory judgment. It is contended that the standard for standing under § 16 of the Clayton Act, 15 U.S.C. § 26, which provides for injunctions in antitrust cases, is different than that under § 4 of the Clayton Act. Section 4 provides in relevant part as follows:

> Any person who shall be injured in his *business or property* by reason of anything forbidden in the antitrust laws may sue therefor . . ., and shall recover threefold the damages by him sustained . . . . (emphasis added)

Section 16 provides in relevant part as follows:

> Any person . . . shall be entitled to sue for and have injunctive relief . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity
> . . . .

The Supreme Court has noted that § 4 and § 16 are "notably different" in that § 16 does not contain the phrase, "injured in his business or property." *Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 260–61, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972). The award of treble damages is a much more drastic remedy than the granting of an injunction, involving as it does cumulative claims and a possibly ruinous

liability. The difference in the severity of the remedy may account for the broader language in § 16. 405 U.S. at 261–62, 92 S.Ct. 885. Perhaps the broader language of § 16 does merit a more lenient application of the standing test of *Data Processing,*[3] but in *United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954), the Supreme Court stated that "under § 16 of the Act, 15 U.S.C. § 26, a private plaintiff may obtain injunctive relief against such violations only on a showing of 'threatened loss or damage;' and this must be of a sort *personal to the plaintiff.*" (emphasis added). *See also Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674 (9th Cir. 1976), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *Nassau County Association of Insurance Agents, Inc. v. Aetna Life & Casualty Co.,* 497 F.2d 1151, 1154 n. 4 (2d Cir. 1974), *cert. denied,* 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974); *NAACP v. New York Clearing House Association,* 431 F.Supp. 405 (S.D.N.Y.1977).

Cases granting standing to associations to assert the constitutional rights of their members are not relevant to our consideration here. In *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Supreme Court, in granting standing to an association to present the constitutional claims of its members, stated that to compel the individual members to present their constitutional claims "would result in nullification of the right at the very moment of its assertion." 357 U.S. at 459, 78 S.Ct. at 1170. In this case, such a nullification would not result, for the individual contractors could come forward and sue. And in *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920 (2d Cir. 1968), the

---

**3.** *See, e. g., In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, State of California v. Automobile Manufacturers Association, Inc.,* 481 F.2d 122, 130 (9th Cir. 1973), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), *reh. denied,* 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104, 92 S.Ct. 885 (1974), where the court stated that because the injunctive remedy does not involve the punitive and potentially disastrous judgments of the treble damages remedy, the "courts have not exercised the

same pronounced restraint in granting standing under section 16 as they have done under section 4." In this case, however, the plaintiffs had alleged an injury to themselves, so that the first part of the *Data Processing* standing test had been met. The court was applying its more relaxed standing standard only in regard to the second part of the standing test; whether the interest sought to be protected is within the zone of interests protected by the statute.

court stated that the question of standing depends on whether there is a *compelling need* to grant the association standing so the constitutional rights of persons not immediately before the court might be vindicated. Such a compelling need does not appear from the complaint in this case; AGC's member contractors could assert their rights by suing in their own behalf.

■ Because plaintiff has not alleged an injury or threatened injury in fact to itself, but has asserted only alleged injuries to its members generally, it lacks standing to sue under § 16 of the Clayton Act, 15 U.S.C. § 26. Counts 1 and 2 of plaintiff's amended complaint are dismissed for failure to state a claim upon which relief can be granted. *See Farmers Co-op Oil Co. v. Socony Vacuum Oil Co., Inc.,* 133 F.2d 101 (8th Cir. 1942).

## II. *The State Law Claims*

Counts 3, 4 and 5 of plaintiff's amended complaint allege that the Stabilization Agreement violates North Dakota law. Defendant Bechtel contends the state law claims are preempted by the extensive federal legislation in the field of labor-management relations, particularly the National Labor Relations Act, as amended, 29 U.S.C. §§ 151–182, and that plaintiff's cause of action should be dismissed for want of jurisdiction. Plaintiff, in reply, contends that the state law claims are within § 14(b) of the Taft-Hartley Act, 29 U.S.C. § 164(b), and are therefore specifically excepted from the federal regulatory scheme.

■ Because this action is here on removal from the state court, this court's jurisdiction is dependent upon the jurisdiction of the state court where the action was commenced.[4] If the North Dakota court did not have subject matter jurisdiction of the dispute, neither does this court.[5] The disposition of this motion to dismiss, then, depends upon whether the state court would have been empowered to hear these claims by virtue of some exception to federal regulation in the field of labor law. If the state court would have had no such power, the action must be dismissed.

■ Section 8 of the National Labor Relations Act (NLRA), 29 U.S.C. § 158, enumerates certain practices of both employers and employees, called "unfair labor practices," which are declared to be unlawful. Section 10(a) of the NLRA, 29 U.S.C. § 160(a), provides that the National Labor Relations Board (the Board), is empowered to prevent any person from engaging in an unfair labor practice listed in § 8 which affects commerce.[6] The power given the Board is an exclusive one, and neither state courts nor federal courts may entertain actions brought under § 8. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The standard for determining whether an activity is within the jurisdiction of the Board, and thus outside the jurisdiction of the state and federal courts, is as follows:

---

**4.** *See Lambert Run Coal Co. v. Baltimore & Ohio Railroad Co.,* 258 U.S. 377, 382, 42 S.Ct. 349, 351, 66 L.Ed. 671 (1922) where the Court stated as follows:

> As the state court was without jurisdiction over either the subject-matter or the United States, the District Court could not acquire jurisdiction over them by the removal. The jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction. If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction.

**5.** The Sherman Anti-trust Act claims discussed *supra,* were not subject to the limitations of removal jurisdiction. Those claims were presented for the first time in this court by amendment of the complaint, and an independent basis of jurisdiction existed. 28 U.S.C. § 1337.

**6.** The power of the federal government to regulate labor-management disputes has as its source of authority the Commerce Clause. There does not appear to be any dispute in this case that the Coyote # 1 Power Plant is a project affecting interstate commerce, and that the labor law disputes arising from work on that project are within the scope of federal regulation. *See National Labor Relations Board v. International Union of Operating Engineers, Local 571,* 317 F.2d 638 (8th Cir. 1963) (the building and construction industry is an industry "affecting commerce").

When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations Act], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted. *Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959).

█ The power of the Board over labor disputes extends only to activities under § 8. Activities not listed there or in § 7, 29 U.S.C. § 157, (which is incorporated by reference into § 8) are within the jurisdiction of the state courts. *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board,* 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691 (1949). Section 8, however, is quite comprehensive; most labor-management disputes are within its scope.

Section 14(b) of the Taft-Hartley Act, 29 U.S.C. § 164(b), enacted in 1947, is an exception to the exclusive jurisdiction of the Board. It provides as follows:

Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

█ To understand the scope and application of § 14(b), it is necessary to understand its purpose. Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." This prohibition of the "closed shop" was enacted in 1947 to correct abuses that had arisen under the Wagner Act, enacted in 1935. It applies only to agreements that provide that the employer will hire no one who is not a member of the union at the time of hiring.

█ The proviso to § 8(a)(3), however, provides in part as follows:

That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . ..

Thus, the "union shop," which requires union membership within a certain period after hiring, is permitted.

█ In addition to the closed shop and the union shop, there is another type of "union security" clause commonly used in labor-management agreements. An "agency shop" clause generally provides that while employees do not have to join a union, they are required, usually after 30 days, to pay the union a sum equal to the union initiation fee and are obligated as well as to make periodic payments to the union equal to union dues. *See Oil, Chemical & Atomic Workers International Union, AFL–CIO v. Mobil Oil Corp.,* 426 U.S. 407, 409 n.2, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976). Although the agency shop does not literally require "membership" in a labor union, it is the practical equivalent of such a requirement. The agency shop, therefore, is within the proviso to § 8(a)(3), and is not an unfair labor practice. *National Labor Relations Board v. General Motors Corp.,* 373 U.S. 734, 743, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963).

█ Although the proviso to § 8(a)(3) quite clearly only *permits* the union shop, and, through judicial construction, the agency shop, and does not mandate them or prevent any state from regulating them, *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board,* 336 U.S. 301, 306–312, 69 S.Ct. 584, 93 L.Ed. 691 (1949), Congress enacted § 14(b) to forestall any inference that federal policy was to be exclusive in the area of union security agreements.[7] 336 U.S. at 314, 69 S.Ct. 584.

---

7. Thus, even in the absence of § 14(b), the union shop and agency shop would not be un-

fair labor practices, and would not be within the exclusive jurisdiction of the Board. Section

Sections 8(a)(3) and 14(b) are related in that agreements requiring membership in a union, which agreements are expressly permitted by § 8(a)(3)'s proviso, are the same membership requirements expressly placed within the reach of state law by § 14(b). *Retail Clerks International Association, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 751, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Thus, the states may forbid the union shop and the agency shop, and they may enforce the prohibition. *Retail Clerks International Association, Local 1625, AFL–CIO v. Schermerhorn,* 375 U.S. 96, 102, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963).

Section 14(b) has not been given a broad interpretation by the courts. It speaks of *"agreements requiring membership in a labor organization as a condition of employment."* (emphasis added). Thus, matters leading up to such an agreement, such as picketing an employer's place of business, are not within § 14(b) and are subject to the Board's exclusive jurisdiction. *Retail Clerks International Association, Local 1625, AFL–CIO v. Schermerhorn,* 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963); *Local No. 438, Construction & General Laborers' Union, AFL–CIO v. Curry,* 371 U.S. 542, 83 S.Ct. 531, 9 L.Ed.2d 514 (1963). And agreements that merely require an affiliation with a labor union, such as a non-discriminatory, exclusive hiring-hall arrangement, do not come within § 14(b)'s exception to Board jurisdiction, for such an agreement does not require *membership* in a union. *See, e. g., Laborers' International Union of North America, Local No. 107 v. Kunco, Inc.,* 472 F.2d 456 (8th Cir. 1973); *Stricker v. Swift Bros. Constr. Co.,* S.D., 260 N.W.2d 500 (1977).

It does not appear that the types of "agreements requiring membership in a labor organization as a condition of employment" within § 14(b) extend beyond the union shop and the agency shop. The Supreme Court and Courts of Appeals have never extended § 14(b)'s exception beyond these two types of agreements. Indeed, the Court has stated that "[t]here is much force in the argument that the assessment of any union-security arrangement for the purposes of §§ 7, 8 and 14(b), when there is significant doubt about the matter, is initially a task for the Board . . .." *Retail Clerks International Association, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 755, 83 S.Ct. 1461, 1466, 10 L.Ed.2d 678 (1963). Such deference to the Board in doubtful cases is consistent with Court's statement in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), that federal and state courts must defer to the exclusive competence of the Board when the activity in question is arguably subject to §§ 7 or 8 of the NLRA.[8]

In light of the foregoing, plaintiff's allegations will now be examined to determine whether they come within § 14(b) and are thus within the state court's jurisdiction. The analysis used in making this determination is as follows: (1) Is the agreement in question within § 14(b), *i. e.,* is it a union shop or agency shop agreement or its equivalent? If the answer to this question is affirmative, the state court has jurisdiction. If the answer is negative, the following question must be answered: (2) Is the agreement or activity arguably an unfair labor practice under § 8? If the answer to this question is affirmative, the state court does not have jurisdiction. If the answer is negative, there is state court jurisdiction, despite the fact that the agreement or activity is not within § 14(b).

### A. Count 3 of the Complaint

Count 3 of plaintiff's amended complaint alleges that Article V of the Stabilization Agreement is in direct conflict with North

---

14(b), then, is a mere clarification of § 8(a)(3). 336 U.S. at 314, 69 S.Ct. 584.

**8.** *See also Oil, Chemical & Atomic Workers International Union, AFL–CIO v. Mobil Oil Corp.,* 426 U.S. 407, 409, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976), where the Court, in discussing the types of union security agreements within § 14(b), limits itself to the union shop and agency shop, and does not intimate that lesser union-security agreements are subject to state regulation.

Dakota's right-to-work law, N.D.Const. § 23 and N.D.Cent.Code § 34–01–14. Article V of the Stabilization Agreement provides in part as follows:

> Contractors performing construction work on the Projects described in this Agreement shall, in filling craft job vacancies, utilize and be bound by the registration facilities and referral systems established or authorized by the International Union signatory hereto when such procedures are not in violation of Federal law. The contractors shall have the right to reject an applicant referred by the Union.

Section 23 of the Constitution of North Dakota provides as follows:

> Every citizen of this state shall be free to obtain employment wherever possible, and any person, corporation, or agent thereof, maliciously interfering or hindering in any way, any citizen from obtaining or enjoying employment already obtained, from any other corporation or person, shall be deemed guilty of a misdemeanor.

Section 34–01–14 of the North Dakota Century Code provides as follows:

> The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization, and all contracts in negation or abrogation of such rights are hereby declared to be invalid, void and unenforceable.

Plaintiff contends that Article V of the Stabilization Agreement violates N.D. Const. § 23 and N.D.Cent.Code § 34–01–14 because it discriminates against employees on account of their status as members or nonmembers of a labor union. If there is such discrimination, it is clear that North Dakota's right-to-work statute is violated, and that Article V is within § 14(b), for it would then require union membership as a

condition of employment; only union members would be referred by the union.[9]

A non-discriminatory referral system, or hiring hall, does not require membership in a labor organization as a condition of employment, *Laborers' International Union of North America v. Kunco, Inc.,* 472 F.2d 456 (8th Cir. 1973), and is not within § 14(b). Even if the referral system is exclusive, *i. e.,* the only way to get hired is to go through the union referral system, § 14(b) does not apply. "Section 14(b) does not empower states to ban all involuntary relationships between workers and unions. It merely allows the prohibition of 'agreements requiring *membership* in a labor organization as a condition of employment . . . .' " 472 F.2d at 458.

Plaintiff contends that the referral system involved here is discriminatory. The Stabilization Agreement does not contain a specific non-discrimination clause, but neither does it mandate discrimination; it is silent on the subject. Plaintiff contends that such silence renders the referral clause *per se* discriminatory. It is true that most of the reported cases dealing with hiring halls have involved agreements containing specific non-discrimination clauses. *See, e. g., Local 357, International Brotherhood of Teamsters v. National Labor Relations Board,* 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); *Laborers' International Union of North America, Local No. 107 v. Kunco, Inc.,* 472 F.2d 456 (8th Cir. 1973); *National Labor Relations Board v. Tom Joyce Floors, Inc.,* 353 F.2d 768 (9th Cir. 1965); *National Labor Relations Board v. Houston Chapter, Associated General Contractors of America, Inc.,* 349 F.2d 449 (5th Cir. 1965); *National Labor Relations Board v. Bechtel Corporation,* 328 F.2d 28 (10th Cir. 1964). And in *Local 357, International Brotherhood of Teamsters v. National Labor Relations*

---

9. If there were discrimination, Article V would appear to be a closed shop agreement, for union membership would be required as a condition of employment at the time of hiring. The closed shop is perhaps not within § 14(b), for it is an unfair labor practice listed in § 8. At least one case has so held. *Walles v. Interna-* *tional Brotherhood of Electrical Workers, AF of L–CIO,* 252 N.W.2d 701 (Iowa 1977). For purposes of this analysis, however, a discriminatory referral system will be assumed to amount to a union shop or agency shop, and thus within § 14(b).

*Board,* 365 U.S. 667, 675, 81 S.Ct. 835, 839, 6 L.Ed.2d 11 (1961), the Supreme Court stated that "[i]t may be that the very existence of the hiring hall encourages union membership." But mere encouragement does not amount to discrimination. To infer discrimination from the silence of the referral clause would be contrary to the Supreme Court's statement in *National Labor Relations Board v. News Syndicate Co., Inc.,* 365 U.S. 695, 699–700, 81 S.Ct. 849, 852, 6 L.Ed.2d 29 (1961), that "we will not assume that unions and employers will violate the federal law, favoring discrimination in favor of union members against the clear command of this Act of Congress. As stated by the Court of Appeals [in *National Labor Relations Board v. News Syndicate Co., Inc.,* 279 F.2d 323, 330 (2d Cir. 1960)], 'In the absence of provisions calling explicitly for illegal conduct, the contract cannot be held illegal because it failed affirmatively to disclaim all illegal objectives.' "

The question to be decided here is not whether there has been an unfair labor practice in violation of the NLRA, as in *News Syndicate,* but whether there has been discrimination so that § 14(b) may apply. The standard to be applied, however, should not differ. This court will not infer a violation of federal *or* state law where such violation is not affirmatively mandated by the agreement.

▨▨▨ The referral clause here is silent on the question of discrimination. Discrimination will not be inferred. Absent discrimination, § 14(b) does not apply, and the state court would not have jurisdiction.[10] *A fortiori,* this court does not have jurisdiction.

10. If there were discrimination *in fact,* the proper forum for any dispute arising from such discrimination would be the National Labor Relations Board, for discrimination based on union membership status is an unfair labor practice. 29 U.S.C. § 158(a)(3). The state courts would not have jurisdiction over discrimination *in fact,* absent an agreement requiring discrimination, for § 14(b) speaks of "the execution or application of *agreements* requiring membership in a labor organization as a condition of employment . . .." (emphasis added).

### B. *Count 4 of the Complaint*

▨▨▨ In Count 4 of the amended complaint, plaintiff alleges that the Stabilization Agreement interferes with the freedom of the employees of its member contractors to engage or refrain from the process of collective bargaining in violation of N.D. Cent.Code §§ 34–08–02, 34–09–01, and 34–12–03. There is nothing in the Stabilization Agreement that resembles a union shop or agency shop clause. Since § 14(b) does not apply in the absence of such union security agreements, there is no state jurisdiction here. Furthermore, the right to engage in or refrain from collective bargaining has nothing to do with an *agreement* requiring membership in a labor organization as a condition of employment; it is a preliminary matter. Collective bargaining *per se* is not a matter with which § 14(b) concerns itself. "[S]tate power, recognized by § 14(b), begins *only with actual negotiation and execution of the type of agreement described by § 14(b).* Absent such an agreement, conduct arguably an unfair labor practice would be a matter for the National Labor Relations Board . . .." *Retail Clerks International Association, Local 1625, AFL–CIO v. Schermerhorn,* 375 U.S. 96, 105, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963).[11]

### C. *Count 5 of the Complaint*

▨▨▨ In Count 5 of the amended complaint, plaintiff alleges that the Stabilization Agreement constitutes direct economic intimidation designed to induce its member contractors to alter their mode of business and to limit or increase the rate of wages and fringe benefits paid to their employees,

For § 14(b) to apply, then, there must be discrimination on the face of the agreement, and that discrimination must be in the form of a union security clause, *i. e.,* a union shop or agency shop agreement. *See supra* page 1217.

11. Plaintiff alleges in the alternative in Count 4 that there is a violation of §§ 8(a)(1) and 8(a)(3) of the NLRA, 29 U.S.C. §§ 158(a)(1) and 158(a)(3). If there is indeed such a violation, the National Labor Relations Board has exclusive jurisdiction. 29 U.S.C. § 160(a).

contrary to the laws of North Dakota, particularly N.D.Cent.Code § 34–01–05.[12]

The activity complained of is one arguably subject to § 8 of the NLRA, so it is preempted. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In particular, § 8(b)(2) declares that it is an unlawful labor practice to cause or attempt to cause an employer to discriminate against an employee in violation of § 8(a)(3). Whether the National Labor Relations Board were to actually find an unfair labor practice is another question altogether. But the initial determination of whether there is an unfair labor practice, *i. e.,* whether there is Board jurisdiction, is one best left to the Board. *Retail Clerks International Association, Local 1625, AFL–CIO v. Schermerhorn*, 373 U.S. 746, 755, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).

■■■ The fact that the state statute here is not one specifically directed toward labor-management relations is of no consequence.

> Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959).[13]

---

**12.** N.D.Cent.Code § 34–01–05 provides as follows:

> Every person who, by any use of force, threats, or intimidation, prevents or endeavors to prevent another from employing any person, and every person who uses force, threats, or intimidation to compel another to employ any person, or to force or induce another to alter his mode of carrying on business, or to limit or increase the number of his hired foremen, journeymen, apprentices, workmen, laborers, servants, or other persons employed by him, or their rate of wages or time of service, is guilty of a class B misdemeanor.

**13.** The allegation of "economic intimidation" in plaintiff's amended complaint raises the question of whether the activity complained of is within one of the judicially created exceptions to Board jurisdiction. In *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25*, 430 U.S. 290, 296–97, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Court listed the exceptions to the preemption doctrine. The Court will not apply the preemption doctrine if the activity in question is "a merely peripheral concern of the Labor Management Relations Act . . . [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we would not infer that Congress had deprived the States of the power to act." *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243–44, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Three factors are considered by the courts in determining whether to apply the judicially created exception to federal preemption: (1) is the underlying conduct unprotected by the NLRA, there thus being no risk that permitting a state cause of action to proceed will result in state regulation of congressionally

protected activity?; (2) is there an overriding state interest in protecting residents from certain activity, usually violence or otherwise malicious acts?; and (3) is there a substantial risk that the state cause of action will interfere with the effective administration of national labor policy? *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); *See also Automobile Workers v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); *Machinists v. Gonzales*, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958).

In analyzing the Stabilization Agreement, it is apparent that it is not within any exception to federal preemption. (1) The underlying conduct is protected by the NLRA. The first proviso to § 8(e) of the NLRA specifically permits the arrangement regarding letting of work to subcontractors. In the absence of § 8(e)'s proviso, Article XIV of the Stabilization Agreement may be unlawful. (2) There is not an overriding state interest here. The allegation of "economic intimidation" does not assert a state interest as substantial as that of preventing violence, *Automobile Workers v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), or preventing malicious libels, *Linn v. Plant Guard Workers*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). If mere "economic intimidation" were enough to except an activity from federal preemption, all attempts at labor organization, a protected activity, would be subject to state jurisdiction, for all attempts at organization can be said to involve some form of economic pressure. (3) To allow a state cause of action here would interfere with the effective administration of national labor policy. The purpose of the NLRA is to provide a *federal* system of regulation. To allow an allegation of "economic intimidation" to give state

### III. *Conclusion*

Plaintiff AGC does not have standing to raise the anti-trust claims under Counts 1 and 2. Counts 3, 4 and 5 are not within the jurisdiction of the state court, and are therefore not within this court's jurisdiction.[14]

IT IS ORDERED that the amended complaint is dismissed.

courts power over the labor dispute would subvert the congressionally mandated policy of a uniform national labor law.

14. State law being preempted, jurisdiction is initially vested exclusively in the National Labor Relations Board.