611 F.2d 684
 102 L.R.R.M. (BNA) 3022, 87 Lab.Cas. P 11,719,
1980-1 Trade Cases 63,036
 ASSOCIATED GENERAL CONTRACTORS OF NORTH DAKOTA, a nonprofit
corporation, Appellant,
v.
OTTER TAIL POWER COMPANY, a corporation, and Bechtel
Corporation, a corporation, Appellees.
 No. 78-1828.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 18, 1979.
Decided Nov. 27, 1979.
 
 John D. Kelly, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, N. D., argued, for appellant; Douglas R. Herman, Fargo, N. D., on brief.
 James P. Hargarten, San Francisco, Cal., argued, for appellee; Nilles, Hansen, Selbo, Magill & Davies, Fargo, N. D., Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., on brief.
 Before LAY, HEANEY and HENLEY, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 This is an appeal by the Associated General Contractors of North Dakota (AGC) from the dismissal of its complaint by the United States District Court for the District of North Dakota. The original complaint filed in state court alleged violations of various state labor laws, including the state right-to-work law. The amended complaint, filed after removal to federal court,[1] additionally alleged a violation of federal antitrust laws. The District Court dismissed the complaint on the grounds that the AGC lacked standing, both on its own behalf and in a representational capacity for its members, to raise the antitrust claims and that the state labor law claims were preempted by federal law. We affirm.
 
 
 2
 The District Court considered the matter on a motion to dismiss the complaint. As matters outside the pleadings, namely depositions and affidavits, were considered by the District Court, we treat its action as one granting a motion for summary judgment. Fed.R.Civ.P. 12(b). We assume, as did the District Court, that the facts as stated in the plaintiff's affidavits and complaint are true.
 
 
 3
 The AGC of North Dakota is a nonprofit trade association. Its stated goals include the promotion of fair competition, the improvement of labor conditions and the elimination of unfair and unethical practices in the construction industry. Its active membership consists of 138 general contractors. Seventy-two of these contractors are parties to collective bargaining agreements. The AGC serves as the bargaining agent for many, if not all, of its union contractor members in their collective bargaining negotiations. Sixty-six member contractors do not recognize or bargain with any union.
 
 
 4
 Bechtel Power Corporation has undertaken to construct a large fossil fuel power plant in Mercer County, North Dakota, for the Otter Tail Power Company, Montana-Dakota Utilities and Minn-Kota Power Cooperative. The plant will generate power for distribution in interstate commerce. Bechtel, acting with the knowledge and consent of Otter Tail Power, the agent of the other two power companies, negotiated and executed a written Stabilization Agreement with the Building and Construction Trades Department of the AFL-CIO and several affiliated international unions. The stated purposes of the Stabilization Agreement, which covered all construction work to be performed on the power plant project, were to insure an adequate supply of skilled labor for the project and the continuation of work uninterrupted by labor disputes.
 
 
 5
 The Agreement provides, in part, that the signatory unions are to be the sole and exclusive bargaining representatives for certain classes of manual employees on designated job sites; that contractors working on the project shall, in filling craft-job vacancies, utilize and be bound by the registration facilities and referral systems established or authorized by each of the international unions, when such procedures are not in violation of federal law; and that the subcontractors employed on the project must be a party to a collective bargaining agreement with a lawfully established bona fide union which provides for wages, hours and other economic conditions of employment meeting the minimum standards set out in the Stabilization Agreement. The AGC contends that the Stabilization Agreement is illegal and seeks to enjoin its enforcement.
 
 I.
 
 6
 THE ANTITRUST CLAIMS.
 
 
 7
 In Count One of its complaint, the AGC alleges that Bechtel and Otter Tail, by executing and enforcing Article II of the Agreement (which recognizes signatory unions as the sole and exclusive bargaining agent for the manual employees working on the project) force the AGC member contractors, union and nonunion alike, who are willing, able and qualified to work on the project to recognize the particular unions as the exclusive bargaining agents for their employees on the project site in order to be eligible for the work. It further alleges that this conduct restrains trade and competition in the construction industry in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.
 
 
 8
 In Count Two of the complaint, the AGC alleges that Bechtel and Otter Tail, by executing and enforcing Article XIV of the Agreement (which provides that any work covered by the Agreement shall be contracted only to firms whose employees are represented by a lawfully established bona fide union and compensated under a collective bargaining agreement at not less than the minimum standards set out in the Stabilization Agreement) have forced and are forcing AGC member nonunion contractors into collective bargaining relationships with particular unions in order to be eligible for work as a subcontractor on the project. The AGC alleges that this conduct restrains trade and competition in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.
 
 
 9
 The initial issue presented is whether the AGC has standing to pursue the antitrust claims. The District Court denied standing on the grounds that (1) the AGC had not alleged injury to itself, and (2) an assertion of representational standing based on the allegation of injury to AGC members is not countenanced by Section 16 of the Clayton Act, 15 U.S.C. § 26.[2]
 
 
 10
 The Supreme Court has invoked a two-part test to determine standing. Warth v. Seldin, 422 U.S. 490, 498-501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A court must ascertain, first, whether the plaintiff has met the constitutional requirement of presenting a "case or controversy" has he "suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .' Linda R. S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)." Id. at 499, 95 S.Ct. at 2205. Second, the court must determine whether the "statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Id. at 500, 95 S.Ct. at 2206.
 
 
 11
 Against this background, the AGC contends that it has standing both in its own right and as a representative of its members. Regarding its personal standing, the AGC contends that sufficient allegations of injury to itself exist in its assertions that the "AGC brings this action in its own behalf," and that "(u)nless enjoined, defendants will continue to * * * enforce the Agreement to the irreparable injury of AGC, its member contractors and the general public." These conclusory allegations are insufficient to make out a "case or controversy" because they simply fail to indicate any injury personal to the AGC. It is clear from the complaint and the affidavits that the AGC is not a contractor and does not seek work on this or any other project. Thus, it is not injured in its own right by operation of the Stabilization Agreement.Count One
 
 
 12
 We turn next to AGC's claim of representational standing under Count One of its complaint. Count One alleges that AGC's member contractors, both union and nonunion alike, are harmed by the execution and enforcement of Article II of the Agreement. Article II, however, simply provides, "It is recognized by the parties that the Unions signatory hereto are the sole and exclusive bargaining representatives for the classifications of manual employees, included in Appendix "A" attached hereto (building tradesmen) employed by the Contractors signatory to this Agreement, on the specific jobsites designated herein." The only contractors to sign the Agreement were Bechtel and C. E. Lummus Company-Kaiser Engineers, Inc., neither of which is alleged to be a member of AGC. Article II by its terms thus applies only to the prime contractors and not to the AGC members seeking to subcontract work on the project. AGC members, therefore, would not have standing to complain of its execution and enforcement. A fortiori, the AGC has no standing to press that claim on behalf of its members.
 
 Count Two
 
 13
 The more difficult question is whether the AGC has associational standing to represent the claims of its members under Count Two of its complaint. The AGC contends that at least some of its members have standing to sue individually and that, therefore, the AGC has standing to sue in a representational capacity. Bechtel, on the other hand, contends that associational standing is never appropriate in the context of private antitrust litigation and that it is particularly inappropriate in this case. The District Court agreed with Bechtel, noting:
 
 
 14
 (I)n United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954), the Supreme Court stated that "under § 16 of the Act, 15 U.S.C. § 26, a private plaintiff may obtain injunctive relief against such violations only on a showing of 'threatened loss or damage;' and this must be of a sort Personal to the plaintiff."
 
 
 15
 Cases granting standing to associations to assert the constitutional rights of their members are not relevant to our consideration here. In NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Supreme Court, in granting standing to an association to present the constitutional claims of its members, stated that to compel the individual members to present their constitutional claims "would result in nullification of the right at the very moment of its assertion." 357 U.S. at 459, 78 S.Ct. at 1170. In this case, such a nullification would not result, for the individual contractors could come forward and sue. And in Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968), the court stated that the question of standing depends on whether there is a Compelling need to grant the association standing so the constitutional rights of persons not immediately before the court might be vindicated. Such a compelling need does not appear from the complaint in this case; AGC's member contractors could assert their rights by suing in their own behalf.
 
 
 16
 Because plaintiff has not alleged an injury or threatened injury in fact to itself, but has asserted only alleged injuries to its members generally, it lacks standing to sue under § 16 of the Clayton Act, 15 U.S.C. § 26.
 
 
 17
 457 F.Supp. 1207 at 1214-15 (D.N.D. 1978) (emphasis by the District Court) (additional citations omitted).
 
 
 18
 We agree with the result reached by the District Court. However, we do not agree that associations never have representational standing without a showing of compelling need, I. e., that the rights of the association's members will be nullified if they are required to assert them individually. The District Court placed more reliance than we feel appropriate on the quoted and emphasized language of United States v. Borden Co., supra. This language was dicta and was substantially undercut by later associational standing cases such as Warth v. Seldin, supra, and Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). We therefore detail our reasons for agreeing with the result reached by the District Court.
 
 
 19
 Initially, we briefly examine the differences between § 4[3] actions (the most often litigated private antitrust actions) and § 16[4] actions. The most basic is that § 4 authorizes the award of treble damages to those litigants who successfully press claims arising from past violations of the antitrust laws while § 16 authorizes injunctive relief from the threatened harm of prospective or ongoing violations. Focusing primarily on standing under § 4, we have tried, with only limited success, to create a workable standard for determining who among the multitude of possible victims of antitrust violations are appropriate plaintiffs. See generally Berger and Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809 (1977). Two important justifications for limiting standing under § 4 are the difficulties inherent in determining the damages of indirectly harmed plaintiffs and the possibility of duplicative and ruinous recoveries. Hawaii v. Standard Oil Co., 405 U.S. 251, 263-264, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 130 (9th Cir.), Cert. denied 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). In a § 16 action, however, precise knowledge of the extent of the threatened injury to each plaintiff is not necessary. Partially for this reason, standing under § 16 has emerged as a separate and more lenient doctrine than under § 4. Paschall v. Kansas City Star Co., 605 F.2d 403 at 407-408 (8th Cir. 1979); In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, supra at 130; Tugboat, Inc. v. Mobile Towing Co., 534 F.2d 1172 (5th Cir. 1976). See Hawaii v. Standard Oil Co., supra 405 U.S. at 260-262, 92 S.Ct. 885. The language of § 16, which permits suit by "any person, firm, corporation, or association," also differs from that of § 4, which allows suit by "any person."
 
 
 20
 The narrow issue which we now face is whether Associational standing, traditionally denied under § 4,[5] is, nevertheless, permissible under the more lenient § 16. In considering this question, we find the Supreme Court's opinions in the Warth and Hunt cases to be of seminal importance.
 
 
 21
 In Warth v. Seldin, supra, various organizations and individuals sought to challenge a local zoning ordinance on the grounds that it violated their First, Ninth and Fourteenth Amendment rights. In discussing the standing problems presented by the plaintiff associations, the Court first made it clear that "(e)ven in the absence of injury to itself, an association may have standing solely as the representative of its members." Id. 422 U.S. at 511, 95 S.Ct. at 2211. It then wrote:
 
 
 22
 (W)hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.
 
 
 23
 Id. at 515, 95 S.Ct. at 2213.
 
 
 24
 This language, written in the context of a constitutional challenge to a zoning ordinance, applies equally to determining whether associations have standing to seek injunctive relief in an antitrust context. Indeed, it underscores the primary effect on standing of the remedial distinctions between §§ 4 and 16. While problems regarding the proof and allocation of § 4 damages require the full and personal participation of all claimants, § 16 injunctive relief can issue to the benefit of all injured association members without requiring their individual participation. Therefore, we hold that associations otherwise appropriate to present the issues involved should not be precluded from bringing § 16 actions.[6]
 
 
 25
 In Hunt v. Washington Apple Advertising Comm'n, supra, the Court, in considering whether a state commission had standing to complain that another state's regulation constituted an unconstitutional burden on interstate commerce, shed light on the factors that make an association an appropriate one to bring the contemplated litigation. In granting standing to the Commission, the court stated:
 
 
 26
 (A)n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 27
 Id. 432 U.S. at 343, 97 S.Ct. at 2441.
 
 
 28
 We note, initially, that each of the three requirements must be met. It is doubtful that the AGC meets any of them. Certainly, (b) and (c) are not met.
 
 
 29
 First, the interest that the AGC seeks to protect under Count Two of the complaint is the right of each member who is willing to work on the project to do so without having to sign a collective bargaining agreement with a bona fide union and without having to pay wages and fringe benefits equal to minimum standards. Neither the complaint nor the affidavits enlighten us as to how these interests are germane to the organization's purposes. There is no allegation, express or implied, that restraining enforcement of the Stabilization Agreement will in any way improve labor conditions, eliminate unfair or unethical practices or promote fair competition. Nor is there anything in the affidavits that would tend to flesh out the allegations to show that enforcement of the agreement would interfere with the achievement of any of the stated purposes.
 
 
 30
 Moreover, the claim asserted requires the participation of the individual members of the association. The association is clearly not in a position to speak for its members on the question of whether the Stabilization Agreement is violative of antitrust laws. Their status and interests are too diverse and the possibilities of conflict too obvious to make the association an appropriate vehicle to litigate the claims of its members. See Calvin v. Conlisk, 520 F.2d 1, 10-11 (7th Cir. 1975), Cert. denied, 424 U.S. 912, 96 S.Ct. 1109, 47 L.Ed.2d 316 (1976). Some members are not qualified and others are not willing to work on the project; some stand to benefit from working on the project under the Agreement and still others will be hurt by not being able to do so. The fact that the association voted unanimously to bring the lawsuit sheds little or no light on the germaneness of the lawsuit to the organization's purpose.[7] It is for the court, not the members of the association, to determine whether their interests require individual representation. Here, in view of the actual and potential conflicts, they clearly do.
 
 II.
 THE LABOR LAW CLAIMS
 
 31
 The remaining counts of the AGC's complaint allege that the Stabilization Agreement violates various state labor laws. Count Three alleges that the Agreement forced AGC member contractors otherwise qualified and willing to work on the project to agree to fill craft-job vacancies through the registration facilities and referral systems of certain unions (facilities and systems which were not expressly required to be nondiscriminatory with regard to union membership status) as a condition to securing work on the project, and that the Agreement, therefore, contravened North Dakota's right-to-work law, N.D.Cent.Code § 34-01-14.[8]
 
 
 32
 Count Four alleges that the defendants' execution and enforcement of the recognition, referral, subcontracting and wage rate articles of the Agreement forced AGC member contractors seeking employment on the project "to interfere with the freedom of their employees to engage in or refrain from the process of collective bargaining" in violation of various state laws.[9] In the alternative, the count alleged that the same conduct forced the AGC member contractors to commit unfair labor practices against their employees under federal labor law.
 
 
 33
 Count Five alleges that the previously mentioned articles of the Agreement constituted "direct economic intimidation designed to induce AGC member contractors * * * to alter their mode of business and to limit or increase the rate of wages and fringe benefits paid to their employees," in violation of N.D.Cent.Code § 34-01-05.[10]
 
 
 34
 The District Court noted that its jurisdiction over Counts Three, Four and Five was dependent upon the subject matter jurisdiction of the state court from which these counts were removed. See Lambert Run Coal Co. v. Baltimore & Ohio Railroad Co., 258 U.S. 377, 382, 42 S.Ct. 349, 66 L.Ed. 671 (1922). It then dismissed the count, holding that it lacked jurisdiction in the case because federal labor laws had preempted state regulation of the conduct complained of. On the basis of the District Court's well reasoned opinion, we affirm.
 
 
 35
 As the District Court pointed out, the fundamental issue underlying all three counts is whether § 14(b) of the National Labor Relations Act (NLRA), 29 U.S.C. § 164(b), reserves to the states regulation of conduct otherwise preempted by §§ 8 and 10 of the NLRA, 29 U.S.C. §§ 158 and 160. Section 8 lists various unfair labor practices which fall within the exclusive jurisdiction of the National Labor Relations Board (NLRB) by operation of § 10(a) of the NLRA. Section 8(a)(3) makes it an unfair labor practice for an employer to encourage or discourage membership in any labor organization by discrimination in regard to hire or tenure. It includes, however, a proviso that this prohibition shall not preclude an employer from making an agreement with a union which requires, as a condition of employment, membership in the union after the thirtieth day of the beginning of such employment. 29 U.S.C. § 158(a)(3). Thus, while § 8(a)(3) clearly prohibits closed shops, it permits, by proviso, other forms of union security agreements such as union and agency shops.[11] Section 14(b), however, qualifies the proviso to § 8(a)(3) by authorizing states to prohibit, should they so choose, "the execution or application of agreements requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 164(b).
 
 
 36
 In Count Three, the AGC complains, in substance, that the required use of the unions' referral systems, without an express guarantee that such systems will be nondiscriminatory as regards union membership, makes it inevitable that only union members will be referred to the job. It is clear that if there were actual discrimination in the operation of the referral systems, it would be unlawful to require their use.[12] However, we cannot assume that the systems will be discriminatory simply because they are not expressly made nondiscriminatory, especially when the agreement provides that the referral systems are only mandated when the referral "procedures are not in violation of Federal Law." When operated without discrimination, union referral systems do not require membership in a labor organization as a condition of employment and are, therefore, not subject to state regulation under § 14(b). Laborers' Internat. Un. of N. A. Loc. No. 107 v. Kunco, Inc., 472 F.2d 456 (8th Cir. 1973). Therefore, Count Three of the complaint was properly dismissed.
 
 
 37
 Count Four alleges, in essence, that the total effect of the Stabilization Agreement is the creation of a union shop in which the AGC members are "forced" to violate the freedom of their Employees to engage in or refrain from the process of collective bargaining. This allegation fails, on several grounds, to state a claim for relief.
 
 
 38
 First, it is clear that the rights allegedly violated are not the rights of AGC members but the rights of their employees. Thus, the AGC is attempting to litigate the rights of third parties without so much as an allegation that the employees would be burdened by raising those rights themselves. The assertion of the employees' rights is properly left to a plaintiff who actually has those rights.
 
 
 39
 Second, the conduct alleged is, at most, an unfair labor practice under § 8(a) (3) subject to the exclusive jurisdiction of the National Labor Relations Board. It is, therefore, not conduct regulable by the states through § 14(b). San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Section 14(b) applies only to "agreements requiring membership in a labor organization as a condition of employment." As the Supreme Court said in Retail Clerks v. Schermerhorn, 375 U.S. 96, 105, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963), "state power, recognized by § 14(b), begins Only with actual negotiation and execution of the type of agreement described by § 14(b)." (Emphasis in original.) Here, no agreement exists which requires employees of the AGC member contractors to belong to a labor organization as a condition of their employment. Such an agreement, if any were to be made, would have to be made between AGC members and various unions. The Stabilization Agreement is, at most, then a form of pressure analogous to picketing designed to affect the conduct of those who enter into subcontracts. It is, thus, subject to regulation, if at all, as an unfair labor practice under the jurisdiction of the NLRB.
 
 
 40
 For both of these reasons, we hold that the District Court properly denied jurisdiction over Count Four.[13]
 
 
 41
 Finally, we consider Count Five. This count alleges that the Stabilization Agreement constitutes direct economic intimidation designed to induce AGC members to alter their mode of business and to limit or increase the rate of wages and fringe benefits paid to their employees contrary to state law. Of this, the District Court succinctly said:
 
 
 42
 The activity complained of is one arguably subject to § 8 of the NLRA, so it is preempted. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In particular, § 8(b)(2) declares that it is an unlawful labor practice to cause or attempt to cause an employer to discriminate against an employee in violation of § 8(a)(3). Whether the National Labor Relations Board were to actually find an unfair labor practice is another question altogether. But the initial determination of whether there is an unfair labor practice, I. e., whether there is Board jurisdiction, is one best left to the Board. Retail Clerks International Association, Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 755, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).
 
 
 43
 457 F.Supp. at 1220.
 
 
 44
 We agree with this analysis and note that, on appeal, the AGC has offered no argument regarding this count which was not already disposed of in the District Court's opinion.
 
 
 45
 In conclusion, we affirm the dismissal of all counts of the complaint.
 
 
 
 [1]
 The action was initiated in the District Court of Mercer County, North Dakota. It was removed on the basis of diversity of citizenship, 28 U.S.C. § 1332 to the federal District Court pursuant to 28 U.S.C. § 1441
 
 
 [2]
 The District Court did not reach the question of whether Counts One and Two of the complaint stated a cause of action. We likewise refrain from expressing a view on this question
 
 
 [3]
 Section 4 provides, in relevant part, as follows:
 Any person who shall be injured in his Business or property by reason of anything forbidden in the antitrust laws may sue therefore * * * and shall recover threefold the damages by him sustained(.)
 15 U.S.C. § 15 (emphasis added).
 
 
 [4]
 Section 16 provides, in relevant part, as follows:
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief * * * against threatened loss or damage by a violation of the antitrust laws * * * when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity(.)
 15 U.S.C. § 26.
 
 
 [5]
 See, e. g., Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); Buckley Towers Condominium, Inc. v. Buchwald, 533 F.2d 934 (5th Cir. 1976), Cert. denied, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977); Nassau Cty. Ass'n of Ins. Agts., Inc. v. Aetna Life & Cas. Co., 497 F.2d 1151 (2d Cir.), Cert. denied, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974)
 
 
 [6]
 Bechtel relies upon Buckley Towers Condominium, Inc. v. Buchwald, supra, for the proposition that an association cannot obtain standing as a representative for the harms alleged to its members in § 16 actions. In that case, the plaintiff, an association of condominium owners, attempted to challenge an allegedly illegal tying arrangement involving the condominium's builder. The Court denied standing under § 16. While acknowledging that the Supreme Court in "Warth held that an association may have standing as the representative of its members even in the absence of injury to itself," it found Warth to be "inapposite" to the case before it, stating that injury to the members was not "of the sort that would make out a justiciable case (even if) the members themselves had been parties to the suit." Id. at 938 n. 3. In light of this language, we think this case is better analyzed as one in which the Court determined that neither the association nor its members had presented allegations stating a claim for relief under substantive antitrust law, rather than a case in which standing was actually lacking
 Bechtel also relies upon Nassau Cty. Ass'n of Ins. Agts., Inc. v. Aetna Life & Cas. Co., supra, and N.A.A.C.P. v. New York Clearing House Ass'n, 431 F.Supp. 405 (S.D.N.Y.1977). Nassau County was decided before Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and is of little assistance here. Similarly, in N.A.A.C.P., the court relied heavily on Nassau County to reach its conclusion that "the standing rules developed in treble damage cases apply to the plaintiffs in this injunctive relief action." 431 F.Supp. at 409.
 We think that a better analysis of the associational standing issue under § 16 appears in DeGregorio v. Segal, 443 F.Supp. 1257 (E.D.Pa.1978). There, individual plaintiffs were joined by the Philadelphia Welfare Rights Organization (PWRO) in alleging a conspiracy among nursing homes to fix prices. Both § 4 and § 16 relief were sought. The PWRO was denied standing under § 4 despite the fact that the suit was found to be germane to its purposes because it "failed to demonstrate that Each member would have standing or that individual participation would not be necessary." Id. at 1264 (emphasis in original). This, we take it, reflects a concern with the problems of proving damage in a § 4 action. The association was, however, granted § 16 standing. Citing Warth, the court, in a footnote, wrote:
 In light of the allegations that PWRO members are being denied needed nursing facilities care which places their lives and health in serious jeopardy, the association has adequately asserted "injury to its members of sufficient immediacy and ripeness to warrant judicial intervention."
 Id. at 1265 n. 13 (citation omitted).
 
 
 [7]
 This vote was taken before the filing of the original complaint in state court. There is no indication that a second vote was taken on the amended complaint
 
 
 [8]
 Section 34-01-14 of the N.D.Cent.Code provides as follows:
 The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization, and all contracts in negation or abrogation of such rights are hereby declared to be invalid, void and unenforceable.
 
 
 [9]
 N.D.Cent.Code §§ 34-08-02, 34-09-01, 34-10-02 (repealed 1965), and 34-12-03
 
 
 [10]
 N.D.Cent.Code § 34-01-05 provides as follows:
 Every person who, by any use of force, threats, or intimidation, prevents or endeavors to prevent another from employing any person, and every person who uses force, threats, or intimidation to compel another to employ any person, or to force or induce another to alter his mode of carrying on business, or to limit or increase the number of his hired foremen, journeymen, apprentices, workmen, laborers, servants, or other persons employed by him, or their rate of wages or time of service, is guilty of a class B misdemeanor.
 
 
 [11]
 A closed shop is one in which only union members can obtain work. A union shop is one in which employees are required to join a union within a specified period after starting their employment. An agency shop is one in which the requirement is not of joining a union within the specified period, but of paying the equivalent of union dues within that time, leaving the decision to join to the worker
 
 
 [12]
 Jurisdiction, however, would be in the National Labor Relations Board, not in state court. As noted by the District Court:
 If there were discrimination In fact, the proper forum for any dispute arising from such discrimination would be the National Labor Relations Board, for discrimination based on union membership status is an unfair labor practice. 29 U.S.C. § 158(a)(3). The state courts would not have jurisdiction over discrimination In fact, absent an agreement requiring discrimination, for § 14(b) speaks of "the execution or application of Agreements requiring membership in a labor organization as a condition of employment . . . ." (emphasis added). For § 14(b) to apply, then, there must be discrimination on the face of the agreement, and that discrimination must be in the form of a union security clause, I. e., a union shop or agency shop agreement.
 
 
 [457]
 F.Supp. at 1219 n.10 (emphasis by the District Court)
 
 
 [13]
 In recognition of the problems of preemption facing its Count Four allegation, the AGC also pled that the defendants' conduct could induce its members to commit violations of the federal labor laws. If these were indeed violations of either §§ 8(a)(1) or 8(a)(3) of the NLRA, the National Labor Relations Board would have exclusive jurisdiction. 29 U.S.C. § 160(a)