**MINNESOTA PUBLIC INTEREST RESEARCH GROUP (MPIRG), Plaintiff,**

and

**John Doe, Richard Roe and Paul Poe, Intervening Plaintiffs,**

v.

**SELECTIVE SERVICE SYSTEM, Major-General Thomas K. Turnage, Director; and United States Department of Education, Terrel H. Bell, Secretary, Defendants.**

No. 3–82 Civ. 1670.

United States District Court, D. Minnesota.

Jan. 24, 1983.

E. Gail Suchman and Daniel W. Lass, Minneapolis, Minn., for plaintiff.

Neil H. Koslowe, Dept. of Justice, Washington, D.C., for defendants.

William J. Keppel, Minneapolis, Minn., for intervening plaintiffs John Doe, Richard Roe and Paul Poe.

## MEMORANDUM ORDER

ALSOP, District Judge.

This matter comes before the court upon the motion of defendants Selective Service System and United States Department of Education for judgment on the pleadings. Plaintiff Minnesota Public Interest Research Group (MPIRG) has moved for a preliminary injunction to enjoin the enforcement of Section 1113 of the Department of Defense Authorization Act of 1983, Pub.L. No. 97–252, 96 Stat. 748 (1982) amending the Military Selective Service Act, 50 U.S.C.App. §§ 451–471a (1981). A copy of the amendment is attached as "Exhibit A" to this order.

Plaintiff MPIRG is a college student-directed, nonprofit Minnesota corporation qualified to do business in Minnesota. Plaintiffs John Doe, Richard Roe and Paul Poe are all male residents of Minnesota, 19 to 21 years old, subject to Section 3 of the Selective Service Act who intend to apply for financial aid under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070–1089 for the 1983–84 school year, who will be unable to complete their educations without financial aid, and who cannot file a truthful statement of compliance with Section 3 and regulations thereunder. Defendant Selective Service System is an agency of the United States. Defendant Major-General Thomas Turnage is the Director of the Selective Service System. Defendant United States Department of Education is an agency of the United States. Defendant Terrel H. Bell is the Secretary of the United States Department of Education. Defendants have opposed plaintiff

MPIRG's motion and have moved for judg-ment on the pleadings, alleging that the suit is not justiciable under U.S. Const. art. 3 because plaintiffs lack standing to sue and because the suit does not raise a "case or controversy." Since significant chal-lenges to this court's jurisdiction have been made, the court must examine those issues before considering the merits of the case.

Defendants' motion for judgment on the pleadings will be treated as a motion for summary judgment pursuant to Fed.R. Civ.P. 12(c) because matters outside the pleadings were presented to and considered by the court. In addition, since defendants' challenges to the intervenors' standing and the ripeness of their suit parallel defend-ants' challenges to the original plaintiff's standing and the ripeness of its suit, those issues will be treated together.[1] Finally, this memorandum constitutes the findings of fact and conclusions of law of the court.

## I. The Case or Controversy Requirement

■ Federal courts are courts of limited jurisdiction. They are not to decide ab-stract, hypothetical or contingent questions but instead must focus on a specific live case or controversy. This ripeness doctrine has both a constitutional component based on Article III limitations on judicial power and a prudential component based on the discretionary power of the courts to refuse review for policy reasons.[2] This reluctance to invoke the power of the courts is:

> derived from the historically defined, lim-ited nature and function of courts and from the recognition that, within the framework of our adversary system, the adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antag-onistic demands, actively pressed, which

make resolution of the controverted issue a practical necessity.[3]

■ Ripeness determinations require bal-ancing the need for present adjudication and the hardship of . withholding review against the impact of contingency in mak-ing the issues unsuitable for review at this time.[4] That general rule is easy to state but difficult to apply as the United States Supreme Court recently observed: "the dif-ference between an abstract question and a 'case or controversy' is one of degree ... and is not discernible by any precise test."[5] Difficult as that exercise may be, it is one in which this court must engage; defend-ants are correct when they note that the case or controversy requirement is not a mere technicality.

■ Defendants contend that MPIRG does not allege a specific live grievance based on concrete facts but instead raises a hypothetical chain of events. Since MPIRG cannot point to any student who has actual-ly been denied financial assistance under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070–1089, for failure to meet the registration requirement, defend-ants argue, the suit is premature. Defend-ants cite the following contingencies:

1. a person required to register must fail to do so;

2. that person must apply for assistance or benefits under Title IV;

3. that person must be found otherwise eligible to receive such assistance or bene-fits;

4. that person, after notice of proposed denial and opportunity for a hearing, must fail to establish compliance with the regis-tration requirement; and

---

1. *See* order on motion to intervene of John Doe, Richard Roe and Paul Poe.

2. "The role played by Article III limitations in implementing ripeness doctrine is so unclear that no attempt will be made to distinguish between jurisdictional and merely prudential constraints." 13 Wright, Miller & Cooper *Federal Practice & Procedure: Civil* § 3532 at 240 (1972 ed.).

3. *Poe v. Ullman*, 367 U.S. 497, 503, 81 S.Ct. 1752, 1755, 6 L.Ed.2d 989 (1961).

4. 13 Wright, Miller & Cooper, *supra*, note 2, at 238 (1972 ed. and 1981 pocket part).

5. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).

5. that person must be denied assistance or benefits.

Until this sequence of events actually occurs, defendants claim, MPIRG presents only a nonjusticiable abstract and contingent question. Similarly, defendants contend that the intervenors do not allege a case or controversy for the same reasons.

The court is not persuaded by defendants' argument. "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). In that case, plaintiffs challenged the constitutionality of the Regional Rail Reorganization Act of 1973, 87 Stat. 985, 45 U.S.C. §§ 701–794, alleging it worked an unconstitutional "taking" of property without due process. The district court had found the so-called "conveyance taking" issue not ripe for adjudication because the statutory scheme required several decisional steps before the final conveyance. The district court cited three possible contingencies,[6] one of which was resolved before the case reached the Supreme Court. The Supreme Court, however, found the issue ripe despite the two remaining alleged contingencies. It found, first, that implementation of the Rail Act would lead "inexorably" to the final conveyance, although the exact date of that conveyance could not be presently determined. While it was true that Congress could reject the first reorganization plan presented, the court read the Rail Act to contemplate continued presentation of plans until one was approved. Thus, the court said, it must assume there would be compliance with the Act's mandatory terms at some time. *Id.* at 140, 95 S.Ct. at 356.

Similarly, in the case at bar, defendants argue that the statutory scheme contemplates several steps before any student would be denied assistance or need to invoke the fifth amendment privilege against self-incrimination. Only after a student had first applied and second met eligibility requirements would he, under regulations not yet promulgated, probably be required to submit a certificate of compliance with registration requirements. Only then would a student face self-incrimination problems, defendants argue. Furthermore, assistance would not be denied until the above steps, as well as a notice of proposed denial, a hearing and a failure to cure the noncompliance, occurred.

Section 1113, however, by its terms imposes a mandatory system linking availability of financial aid to draft registration. Section 1113(f)(1) provides that any person required to register who fails to do so *shall be ineligible* for any form of assistance or benefit under Title IV. Subsection (2) provides that "[i]n order to receive any . . . assistance under Title IV [a person required to register] *shall file* . . . a statement of compliance with section 3 and regulations issued thereunder." Subsection (3) requires the Secretary of Education, in agreement with the Director of the Selective Service, to prescribe methods for verifying such statements and provides that the Secretary of Education "*shall issue* regulations to implement the requirements . . . ." It must therefore be presumed that the Secretary will comply with the mandatory terms of Section 1113 and that implementation of the Section will lead inexorably to the denial of financial assistance, although the exact date of that denial cannot be presently determined.

The court in *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), also found that no court was empowered to prevent the final con-

---

**6.** The possibilities were that the reorganization court might determine under § 207(b) that the process was not fair and equitable to the railroad estate, or that Congress might disapprove the final plan under § 208(a), or that the Special Court would not order the final conveyance under § 303(h). The first possibility was eliminated before the case reached the Supreme Court. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974).

veyance and thus the occurrence of the alleged taking was in no way hypothetical or speculative. *Id.* at 143, 95 S.Ct. at 358. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough" the court said, *id.* (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)). In the case now before this court, there is also no provision for judicial review that would prevent the denial of assistance or the alleged burden on fifth amendment rights. Students should not have to risk denial of benefits or jeopardize their privilege against self-incrimination before they can seek judicial redress. If defendants' views were correct, no allegedly unconstitutional law could be challenged on its face. Instead, persons would have to wait until the allegedly unconstitutional law was applied to them, resulting in deprivation of their constitutional rights, before their challenge could be considered ripe. Such an approach would provide minimal protection, if any, to precious constitutional rights and clearly is not a correct interpretation of the law.[7]

Finally, the court in *Regional Rail* found that, because of the structure of the Act, there was no better time to decide its constitutionality to minimize or prevent irreparable injury. Until the reorganization plan was finally developed, immediately before the challenged conveyance, the courts would not have any more settled facts. The conveyance's complexity and the long time lapse probable before valuation review in practical effect made the conveyance irreversible. The court believed it would be

in no better position later than it was then to confront the provision's validity and instead found serious risks associated with delay. *Id.* at 144–45, 95 S.Ct. at 359.

Similarly, since plaintiffs attack this statute as unconstitutional on its face, this court will be in no better position to assess the statute's validity once it has been actually applied to individuals or even once regulations to implement that application have been promulgated. Furthermore, it would appear that the broad constitutional questions raised by a facial attack can be resolved without individualized facts. "The availability of broad constitutional grounds may mean that decision is possible with little individualized factual development."[8] There are no advantages in waiting until April or May of 1983 as defendants suggest. Rather, irreparable harm may occur if the court delays its review. Many students may forgo financial assistance to avoid self-incrimination. Others may waive their privilege against self-incrimination by beginning the aid application process. "Ripeness may be found even though the plaintiff controls the happening of the contingent events whose occurrence would solidify the dispute."[9]

Therefore, the court concludes that both MPIRG and the intervening plaintiffs have raised a justiciable case or controversy: the issues are ripe for decision, more settled facts are unlikely to become available or to prove helpful in assessing the constitutionality of a statute allegedly invalid on its face, and, finally, withholding review creates the risk of irreparable harm to important constitutional rights.

---

7. *See, e.g., Babbitt,* 442 U.S. at 301, 99 S.Ct. at 2310. In that case, plaintiffs challenged the constitutionality of several provisions of Arizona's farm labor statute. One provision specified procedures for election of employee bargaining representatives; plaintiff-appellees admitted that they had not invoked the act's election procedures in the past and did not express any intent to do so in the future. Defendants-appellants said that the court should decline to entertain the challenge until appellees invoked the act's procedures, arguing that the court might thereby acquire information about how the procedures would actually operate in lieu of

appellees' predictive evidence. The court observed that while waiting would "remove any doubt about the existence of concrete injury resulting from application of the election provision, little could be done to remedy the injury incurred . . . ." *Id.* at 301 n. 12, 99 S.Ct. at 2310 n. 12.

8. Wright, Miller & Cooper, *supra,* note 2, at 244.

9. *Id.* at 248. *See also* discussion criticizing *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), *id.* at 251.

## II. Standing

■ Standing, like ripeness, involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise.[10] As with ripeness, it has not always been clear whether particular features of the standing requirement have been required by Article III or by the courts themselves.[11] At a minimum, Art. III requires that the party seeking to invoke the court's jurisdiction show that he or she has personally suffered some actual or threatened injury as a result of the defendant's putatively illegal conduct and that the injury be fairly traced to the challenged action as well as likely to be redressed by a favorable decision.[12] The Supreme Court recently recognized that: "Art. III ... is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the framers of the Constitution ...." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 476, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982).

■ The "injury in fact" that a party must demonstrate in order to have standing is not limited to economic harm.[13] At the same time, the injury in fact test requires more than an injury to some cognizable interest: it requires that the party seeking review be among the injured.[14] Standing analysis focuses on the party seeking to put his or her complaint before the court and not upon the issues the party wishes to have adjudicated.[15] Thus, "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating a problem, is not sufficient by itself ..." to confer standing.[16] As the Supreme Court in *Valley Forge,* 454 U.S. at 486, 102 S.Ct. at 765 noted, "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy."

■ While a party seeking standing generally must allege injury to his or her own rights, the courts have long recognized that an association may have standing to assert the claims of its injured members even where the association itself has suffered no injury from the challenged activity.[17] The courts have not, however, created a per se rule granting an organization standing to sue on behalf of any of its members for any injury.[18] The requirements of "representational standing" were first explained by the Supreme Court in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1974), when it said:

> The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each in-

---

10. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1974).

11. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982).

12. *Id.* at 472, 102 S.Ct. at 758.

13. *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973).

14. *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1971).

15. *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

16. *Sierra Club,* 405 U.S. at 739, 92 S.Ct. at 1368.

17. *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 342, 97 S.Ct. 2434, 2440, 53 L.Ed.2d 383 (1977). *See also Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1974); *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1971); *National Motor Freight Assn. v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963); *NAACP v. Alabama,* 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958).

18. *O'Hair v. White,* 675 F.2d 680, 691 (5th Cir. 1982).

jured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Id.* at 511, 95 S.Ct. at 2211. These same requirements were later clarified and set forth as a three-part test in *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). There the court determined that an association has representational standing when:

1. its members would otherwise have standing to sue in their own right;

2. the interests it seeks to protect are germane to the organization's purpose; and

3. neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

By so limiting representational standing, the court has ensured that the constitutional and prudential restrictions on standing are applied to organizations as well as to individuals. The first requirement ensures that there has been some injury in fact to the party who appears, through its representative, in court. The second establishes that the representative appearing is entitled to represent the injured party on that particular matter. The third assures the court that allowing the parties to proceed in a representational capacity will not harm the individual interests allegedly protected by the representative.

■ With these general principles in mind, we turn now to the facts of this case. Plaintiff MPIRG does not allege that it has standing in its own right. Instead, it asserts only representational standing.[19] Thus, MPIRG's standing must be tested against the three-part test elucidated in *Hunt.* For purposes of ruling on defendants' motion for summary judgment based

on lack of standing, we must accept as true all material allegations of the complaint and must construe the complaint in plaintiff's favor.[20] It is within the court's power to allow plaintiff to supply further particularized allegations of fact deemed supportive of plaintiff's standing and this the court has done by granting plaintiff leave to amend its complaint.[21] If, after this opportunity, plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed. *Warth v. Seldin,* 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1974).

Defendants contend that plaintiff MPIRG has failed to meet the *Hunt* test. First, defendants allege, MPIRG does not establish that its members would have standing to sue in their own right. In essence, defendants repeat their ripeness arguments, alleging that no MPIRG members have yet been denied assistance or compelled to file a statement of compliance. Therefore, defendants argue, no members have suffered "injury in fact" and no members would have standing to sue as individuals. Defendants propound a similar argument against the standing of the intervenors, claiming that they have not suffered actual injury and therefore have not met the "injury in fact" test. As the court has determined in its discussion of ripeness, Part I, *supra,* plaintiffs' members are not required to submit to actual injury before being allowed to vindicate their rights. *Threatened* injury is firmly established as meeting the injury in fact test.[22] Therefore, both the intervenors and three individual MPIRG members would have standing to sue. As a result, MPIRG meets the first prong of the *Hunt* test.

Second, defendants allege, plaintiff has failed to establish that the membership interests MPIRG seeks to protect are germane to its purposes. Defendant notes that

---

**19.** *See* MPIRG's Amended Complaint. In response to specific questions from the court at the hearing held January 10, 1983, MPIRG's attorney, Ms. Gail Suchman, confirmed that MPIRG sought *only* representational standing.

**20.** *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206.

**21.** Order dated January 24, 1983.

**22.** *See, e.g., Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923).

the original complaint and the amended complaint allege only that MPIRG is a "college student-directed non-profit Minnesota corporation." There are no allegations about MPIRG's purposes, the qualifications, rights and privileges of membership, about how membership interests are determined, or about whether the particular membership interests MPIRG seeks to protect are germane to its purposes. Even if the court considers plaintiff's statements in its memorandum in support of its motion for a preliminary injunction that MPIRG is "concerned with energy, environmental, consumer and other issues" and that "[m]any of the issues in which MPIRG has been involved directly relate to student concerns, such as landlord-tenant problems and financial aid," [23] defendants contend that this self-description shows "MPIRG ... to be an organization with the broadest of concerns, the 'public interest,' which seeks ... to act as an advocate of a particular point of view which may 'relate' to 'student concerns' ...." [24]

Plaintiff, on the other hand, alleged in oral argument that its purposes are to examine and take positions on issues that affect the student community and that MPIRG's student-elected student board of directors voted unanimously to file this action. The implicit assumption is that such an organization is obviously concerned about potential denial of student financial aid. In a letter to the court following the hearing, MPIRG further clarified its purposes as stated in its articles of incorporation. Those purposes are "to promote the public interest and social welfare." [25] MPIRG also pointed to its "long-standing history of protecting the interests of students in many diversified areas in accordance with its broad mandate." [26] Finally,

both in oral argument and in its letter, MPIRG observed that it had been granted standing as a representative of student rights previously in this district. [27]

In *Associated General Contractors v. Otter Tail Power Co.*, 611 F.2d 684 (8th Cir. 1979), the court of appeals of this circuit applied the *Hunt* factors. The case is particularly instructive. In *Associated General Contractors*, a nonprofit trade association (AGC) composed of 138 general contractors alleged that a stabilization agreement negotiated between the defendant power corporations and several labor unions covering all construction work on a power plant project violated state labor laws and federal antitrust laws. The district court dismissed on the grounds that the association lacked standing, both on its own behalf and in a representational capacity. While the circuit court felt the district court erred in requiring the association to show compelling need before it could sue as its members' representative, the circuit court did agree with the trial court's result. The court found that determining whether representational standing was available in a § 16 Clayton Act action depended, as in other types of actions, on an analysis of the *Hunt* factors.

The circuit court said initially that each of the three *Hunt* requirements must be met. It found it doubtful that AGC met any of them, but found it certain that the second and third requirements were not met. [28] In determining whether the interests AGC sought to protect were germane to its purposes, the court first identified the interest to be protected as the right of each member willing to work on the project to do so without having to sign a collective bargaining agreement and without having to pay wages and fringe benefits equal to

23. Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction, at 1.

24. Defendants' Memorandum in Opposition to Plaintiff's Motion for Leave to Amend Complaint, at 5 n. 3.

25. Letter from E. Gail Suchman, attorney for MPIRG (January 13, 1983) at 1.

26. *Id.*

27. *See MPIRG v. Butz,* 498 F.2d 1314 (8th Cir. 1974); *MPIRG v. Gordon Johnson,* No. 4–72 Civ. 255 (D.Minn. Sept. 22, 1982).

28. *Associated General Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 690 (8th Cir.1979).

minimum standards.[29] The stated purposes of AGC were to promote fair competition, improve labor conditions and eliminate unfair and unethical practices in the construction industry.[30] The court next noted that:

> Neither the complaint nor the affidavits enlighten us as to how these interests are germane to the organization's purposes. There is no allegation, express or implied, that restraining enforcement of the Stabilization Agreement will in any way improve labor conditions, eliminate unfair or unethical practices or promote fair competition. Nor is there anything in the affidavits that would tend to flesh out the allegations to show that enforcement of the agreement would interfere with the achievement of any of the stated purposes.

*Associated General Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 691 (8th Cir. 1979).

Viewing the pleadings in the light most favorable to plaintiff, the court is convinced that plaintiff MPIRG has not shown it seeks to protect interests germane to its purposes. Plaintiff makes no allegation in its complaint, amended complaint, or affidavits of its purposes. Even when we look to plaintiff's memorandum, oral argument, and correspondence for evidence of its purposes, we find an organization concerned with the broad "public interest and social welfare." It may be true that many of the issues MPIRG has been involved with relate to "student concerns" and that it is an ·organization primarily but not wholly funded by students. Its purposes, however, are not solely limited to research and debate on issues that affect students as students. Instead, its very broad mandate shows that it is concerned like any other public interest group with issues that affect its members, most of whom are students, as citizens.[31] Under MPIRG's conception of its purposes, the court can think of few cases or issues where MPIRG would not have standing.

The cases that have granted MPIRG standing in this district are inappropriate, this court believes, because they predate the clarification of representational standing by the Supreme Court in *Hunt* and the Eighth Circuit's opinion in *Associated General Contractors.* Under the *Hunt* test, MPIRG would most likely not have standing, for example, to challenge logging in the BWCA simply because 34 of its members had used the BWCA and planned to continue such use.[32] As another district court explained, "[T]he association's representative capacity will seldom, if ever, extend to all of its members' interests. A local PTA, for example, cannot be expected to represent its members in matters not relating to education." [33]

The Eighth Circuit in *Associated General Contractors* found that a contractors' trade association whose purposes included promotion of fair competition, improved labor conditions, and elimination of unethical practices in the industry did not have standing to challenge an agreement that allegedly forced its members (half of whom were nonunion) into collective bargaining relationships in restraint of competition. The

---

**29.** The agreement provided that signatory unions were the sole bargaining representatives for certain classes of manual employees on designated job sites; that contractors on the ·project should fill job vacancies by a registration and referral system established by each of the unions, when such procedures did not violate federal law; and that subcontractors on the project must be a party to a collective bargaining agreement with a lawful union that provided for wages, hours and other terms of employment meeting the minimum standards set in the agreement. *Id.* at 686–87.

**30.** *Id.* at 686.

**31.** Membership in MPIRG is never defined although the court assumes that 40,000 plus students who have paid fees comprise most or a large portion of the membership.

**32.** *MPIRG v. Butz,* 358 F.Supp. 584, 597 (D.Minn.1973), *aff'd,* 498 F.2d 1314 (8th Cir. 1974). *Compare United States v. SCRAP,* 412 U.S. 669, 678, 93 S.Ct. 2405, 2411, 37 L.Ed.2d 254 (1973), where the association's "primary purpose [was] to enhance the quality of the human environment ..." and the members claimed harm resulting from adverse environmental impact.

**33.** *Boyce v. Rizzo,* 78 F.R.D. 698, 704 (E.D.Pa. 1978) (finding second element of *Hunt* met).

court looked to the complaint and affidavits for some express or implied allegation that would connect the organization's purposes and the interests it sought to protect in a representational capacity. Finding no such allegations, it held that the second *Hunt* element was not met.

Similarly, we can find no where in plaintiff's complaint, amended complaint, oral argument, or even its briefs and letter to the court any explanation of how the interests it seeks to protect (presumably the interest in availability of financial aid without allegedly unconstitutional restrictions) [34] are germane to its broad public interest purpose. The Supreme Court in *Valley Forge* observed that, "This Court repeatedly has rejected claims of standing predicated on 'the right, possessed by every citizen, to require that the Government be administered according to law ....' Such claims amount to little more than attempts 'to employ a federal court as a forum in which to air ... generalized grievances about the conduct of government.'" [35] We therefore conclude that plaintiff MPIRG has failed to meet the second requirement for representational standing.

Finally, defendants allege, plaintiff has failed to meet the third requirement because it has not shown that participation of individual members is not necessary. Defendants contend that there is a diversity of view among MPIRG members about the registration requirement and they note that 97.56 percent of all persons required to register in Minnesota have done so. In addition to this ideological diversity of view, defendants allege that there is a financial conflict of interest among MPIRG members about this suit. Defendants reason that more Title IV money will be available to eligible students if those who fail to register become ineligible. Therefore, it is in the financial interest of many MPIRG members to defend the Act's constitutionality.

Plaintiff acknowledges that there is a diversity of view among its members but claims that such diversity is unimportant in light of the unanimous decision of the duly elected student board of directors to file this suit. [36] Furthermore, those who may not be declared ineligible (for example, women) may not necessarily support the statute; therefore, the alleged diversity of view may not be great.

The Eighth Circuit in *Associated General Contractors* found that the association had failed to meet the third element of the *Hunt* test because the asserted claim required the participation of individual members. The court found that the association was clearly not in a position to speak for its members on the issue:

> Their status and interests are too diverse and the possibilities of conflict too obvious to make the association an appropriate vehicle to litigate the claims of its members .... Some members are not qualified and others are not willing to work on the project; some stand to benefit from working on the project under the Agreement and still others will be hurt by not being able to do so.

611 F.2d 684, 691 (8th Cir.1979).

The Eighth Circuit has construed *Hunt* quite strictly. The United States District Court of Maryland, in a similar case, has said that "[t]he third prong of the *Hunt* test involves two considerations: (1) whether the nature of the claims involves individualized proof," citing *Hunt* and "(2) whether the association is competent to speak for its members," citing *Associated General*. [37] The Maryland court then analyzed defendants' contention that the plaintiffs' members' interests were too diverse to be represented by the association. The court specifically declined to follow what it termed the

---

**34.** MPIRG never explicitly identifies the interests it seeks to protect.

**35.** 454 U.S. 464, 482–83, 102 S.Ct. 752, 763–64, 70 L.Ed.2d 700 (1982) (citations omitted).

**36.** *See* Letter from E. Gail Suchman (January 13, 1983) and statements at oral argument, January 10, 1983.

**37.** *National Contractors Assoc. v. National Electrical Contractors Assoc., Inc.*, 498 F.Supp. 510, 521 (1980).

Eighth Circuit's lead and implied that evidence that some members would actually *benefit* from the challenged provision, rather than evidence that some members · did not feel *harmed* by it, would be required before the Maryland court would find the dissenting members' individual participation necessary. The Eighth Circuit thus appears fairly ready to find that a diversity of view necessitates individualized participation, preventing representational standing.

The Tenth Circuit expressed a similar concern when faced with an association seeking representational standing whose members allegedly possessed diverse views.[38] The court noted that many of the member colleges might not support the NCAA's effort to overturn regulations that would put women's intercollegiate sports on a par with men's because many of the members belonged to a women's intercollegiate sports association, the AIAW, that was on the other side of the litigation. If unofficial contingents of the members were seen cheering both sides of the litigation, the court said, there would be no "case or controversy."

> We hold that when an association does not have standing in its own right, and it is not clear which side of the lawsuit the association's members would agree with, one or more members must openly declare their support of the association stance, and they must do so through those officials authorized to bring suit on their behalf. Moreover, if more members of the association declare *against* the association's position than declare in favor of it, the association does not have standing, for then the parties in the lawsuit most likely would not be adverse.

*National Collegiate Athletic Association v. Califano,* 622 F.2d 1382, 1391–92 (10th Cir.

1980). Since members were formally advised by the council of the possible necessity for the suit and voted to adopt the report containing such advice, however, the court found that the association had representational standing.[39] The United States Supreme Court has also found that an association lacked representational standing because of its members' diversity of view.[40]

The court concludes that the claim asserted by plaintiff MPIRG requires the participation of its individual members. As in *Associated General Contractors,* the status and interests of the members are diverse. Their only common tie is that they are students. Students, like other segments of the population, may have diverse views on the propriety of linking financial aid to draft registration. MPIRG concedes this diversity exists.[41] Some of the members may not want financial aid; others may not qualify for it even absent the challenged provisions. Many of the members, for example men outside the registration age bracket or women, are not subject to the provision; others may be subject to the registration requirements but may still support the provision. While it is not clear to the court that some members will actually benefit from the provision via increased aid as defendants contend, it is clear that some members will not be harmed by experiencing either denial of financial assistance or burdens on their fifth amendment rights. The court finds *Associated General Contractors* controlling and, as in that case, finds that MPIRG is clearly not in a position to speak for its members on this issue. Therefore, plaintiffs have failed to meet the third requirement of representational standing.

Plaintiff MPIRG lacks standing to bring this suit because, first, it has failed to show

---

**38.** *National Collegiate Athletic Association v. Califano,* 622 F.2d 1382 (10th Cir.1980).

**39.** The Tenth Circuit dealt with the diversity of view problem in its analysis of the second, as opposed to the third, *Hunt* requirement.

**40.** *Harris v. McRae,* 448 U.S. 297, 321, 100 S.Ct. 2671, 2690, 65 L.Ed.2d 784 (1980). This

case arguably is distinguishable because it involved a free exercise claim which ordinarily requires individual participation to show the statute's impact on the individual's exercise of his or her religion.

**41.** Statements of E. Gail Suchman, attorney for MPIRG, at oral argument, January 10, 1983.

that the interests it seeks to protect are germane to its purposes and, second, the claim asserted is one that requires the participation of individual members. Therefore, defendants' motion for summary judgment as to MPIRG will be granted. Pursuant to Fed.R.Civ.P. 54(b), the court finds that there is no just reason for delaying the entry of judgment as against the plaintiff MPIRG.

Dismissal of the plaintiff MPIRG, however, does not require dismissal of the intervening plaintiffs. If there is an independent basis for the intervenors' jurisdiction, the court has discretion to treat their pleading as a separate action in order to adjudicate their claims.[42] The court may exercise this discretion where it appears that failure to adjudicate the claim will only result in unnecessary delay.[43] The court has ruled that the intervenors have standing and that the issue they seek to raise is ripe. They clearly allege federal question jurisdiction. By allowing the action to continue with respect to the intervenors, the court can avoid the senseless "delay and expense of a new suit, which at long last [would] merely bring the parties to the point where they now are." *Hackner v. Guaranty Trust Co.,* 117 F.2d 95, 98 (2d Cir.1941).

Upon the foregoing,

IT IS ORDERED That defendants' motion for judgment on the pleadings, treated pursuant to Fed.R.Civ.P. 12(c) as a motion for summary judgment, as against plaintiff MPIRG be and hereby is granted.

IT IS FURTHER ORDERED That the clerk enter judgment as follows:

IT IS ORDERED, ADJUDGED AND DECREED That the Complaint of plaintiff Minnesota Public Interest Research Group (MPIRG) be and the same hereby is dismissed for lack of standing.

---

**42.** *See McKay v. Heyison,* 614 F.2d 899 (3d Cir.1980); *Miller & Miller Auctioneers, Inc. v. G.W. Murphy Industries, Inc.,* 472 F.2d 893, 895–96 (10th Cir.1973); *Atkins v. State Board of Education,* 418 F.2d 874 (4th Cir.1969); *Fuller v. Volk,* 351 F.2d 323 (3d Cir.1965); *Hackner v. Guaranty Trust Co.,* 117 F.2d 95 (2d Cir. 1941), *cert. denied,* 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520; *Corporation Venezolana de Fomento v. Vintero Sales Corp.,* 477 F.Supp.

615, 622 (S.D.N.Y.1979); *Pikor v. Cinerama Prods. Corp.,* 25 F.R.D. 92 (S.D.N.Y.1960); *Truncale v. Universal Pictures Co.,* 76 F.Supp. 465 (S.D.N.Y.1948); 7A Wright & Miller, *Federal Practice & Procedure: Civil* § 1917 at 586 (1972 ed. and 1981 pocket part).

**43.** *Miller & Miller Auctioneers, Inc. v. G.W. Murphy Industries, Inc.,* 472 F.2d 893, 896 (10th Cir.1973).

---

## EXHIBIT A

### ENFORCEMENT OF MILITARY SELECTIVE SERVICE ACT

SEC. 1113. (a) Section 12 of the Military Selective Service Act (50 U.S.C.App. 462) is amended by adding after subsection (e) the following new subsection:

"(f)(1) Any person who is required under section 3 to present himself for and submit to registration under such section and fails to do so in accordance with any proclamation issued under such section, or in accordance with any rule or regulation issued under such section, shall be ineligible for any form of assistance or benefit provided under title IV of the Higher Education Act of 1965.

"(2) In order to receive any grant, loan, or work assistance under title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.), a person who is required under section 3 to present himself for and submit to registration under such section shall file with the institution of higher education which the person intends to attend, or is attending, a statement of compliance with section 3 and regulations issued thereunder.

"(3) The Secretary of Education, in agreement with the Director, shall prescribe methods for verifying such statements of compliance filed pursuant to paragraph (2). Such methods may include requiring institutions of higher education to provide a list to the Secretary of Education or to the Director of persons who have submitted such statements of compliance.

"(4) The Secretary of Education, in consultation with the Director, shall issue regulations to implement the requirements of

this subsection. Such regulations shall provide that any person to whom the Secretary of Education proposes to deny assistance or benefits under title IV for failure to meet the registration requirements of section 3 and regulations issued thereunder shall be given notice of the proposed denial and shall have a suitable period (of not less than thirty days) after such notice to provide the Secretary with information and materials establishing that he has complied with the registration requirement under section 3. Such regulations shall also provide that the Secretary may afford such person an opportunity for a hearing to establish his compliance or for any other purpose."

(b) The amendment made by subsection (a) shall apply to loans, grants, or work assistance under title IV of the Higher Education Act for periods of instruction beginning after June 30, 1983.